LEUTHOLD, Plaintiff, *v.* BRANDJORD, Commissioner of State Lands, et al., Defendants.

(No. 7,429.)

(Submitted May 8, 1935. Decided May 31, 1935.)

[47 Pac. (2d) 41.]

*Mr. A. J. Galen, Mr. Lew. L. Callaway* and *Mr. Paul T. Keller,* for Plaintiff, submitted a brief; *Mr. Galen* and *Mr. Callaway* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Oscar A. Provost,* Assistant Attorney General, appearing in behalf of Defendants; *Mr. Provost* argued the cause orally. (Note: Brief of plaintiff in *Rathbone* v. *State Board of Land Commissioners,* post, p. 109, considered by court as brief of defendants.)

*Mr. C. H. Loud, Mr. S. P. Wilson, Mr. J. A. Poore, Mr. W. G. Gilbert, Mr. Max P. Kuhr, Mr. Ernest A. Peterson, Mr. P. R. Heily, Mr. L. J. Onstad, Mr. E. A. Overland, Mr. W. C. Husband, Mr. W. R. Flachsenhar, Mr. Thomas Dignan, Mr. M. L. Parcells, Mr. John A. Tressler, Mr. Harry P. Bennett* and *Mr. T. B. Weir,* representing the Montana Stockgrowers Association and the Montana Woolgrowers Association, appearing as *Amici Curiae,* submitted a brief; *Mr. Weir* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

John H. Leuthold, a citizen and resident taxpayer of, and who has been engaged in raising livestock in, Montana for more than 25 years past, and who on December 9, 1933, was issued a lease on certain state grazing lands with the expiration date fixed at February 28, 1935, instituted this special proceeding for a writ of mandate to compel I. M. Brandjord, commissioner of state lands and investments, and the state land board, to extend the term of his lease for an additional three years from the date of expiration, in conformity with the provisions of Chapter 61, Laws of 1935.

The plaintiff's petition shows that prior to 1933 it was the universal practice of the Land Department to issue all such leases for the full term of five years. From 1927 to 1933, the maximum annual rental on state grazing lands was $100 per section, "except where the leasing price is increased above this sum by competitive bidding." (Sec. 25, Chap. 60, Laws 1927.)

The Legislative Assembly of 1933, in view of the depression and the uncertainty of profitably conducting the livestock business, and, perhaps, the uncertainty of securing leasers at the leasing price then in effect, reduced the rates fifty per cent. (Chap. 42, sec. 3, Laws 1933.) After this Act became effective, Leuthold and other stockmen made application for the customary five-year leases at the new leasing price in the absence of competitive bidding. The defendant commissioner denied these applications, and issued to Leuthold and many others in like situation, leases expiring on February 28, 1935, although during the same year many leases of state lands were executed for the full five-year period. It is alleged that this action constituted a discrimination against the plaintiff and those in like situation, and that the livestock business cannot be successfully conducted on lands leased for a short term.

With this situation presented, the Legislative Assembly of 1935 enacted Chapter 61, Laws of 1935, which declares: "That all leases of state lands for grazing purposes issued * * * for a period of two years or less, terminating on the 28th day of February, 1935, pursuant to the provisions of Chapter 42 * * * shall, at the option of lessees in good standing, be extended for an additional period of three years from and after February 28, 1935, so as to give to such lessees the same privileges, benefits, and advantages as are under authority of law conferred upon persons holding leases of such lands for a five-year period." (Sec. 1.) Section 2 of the Act requires the "Registrar of State Lands" to give notice by registered mail to each lessee entitled to the benefits of the Act of his "preference right to have the lease of the state lands by him so held extended * * * so as to place him on a basis of equality

with those holding similar leases * * * for a five-year period."

It is alleged that the defendant commissioner failed and refused to comply with the provisions of section 2, above, but nevertheless this plaintiff, pursuant to the provisions of the Act, and before the expiration of his short-term lease, to-wit, on February 13, 1935, made formal application for an extension thereof, and accompanied his application by a remittance of the next two years' rental in advance. This application was rejected on the advice of the Attorney General that the Act was unconstitutional, and the plaintiff notified that the leasing of the lands in question would be put up for open competitive bidding, but that the plaintiff would have "preference rights" in re-leasing such lands. The plaintiff notified the officials that he protested such action and would stand on his rights under the Act of 1935.

It is alleged that a re-leasing of these lands would greatly decrease the value of the lease, as all leases issued subsequent to February 28, 1935, contain the provision, not included in former leases, that "the right is hereby reserved by the state to cancel and terminate this lease at the end of any rental year in case the state desires to exchange the land with the United States or lease it to a State Cooperative Grazing Association."

On the petition filed, an alternative writ of mandate was issued out of this court, and, on behalf of the defendants, the Attorney General filed a motion to quash on the ground that neither the petition nor the writ, nor both together, state facts sufficient to entitle the plaintiff to the relief sought, or to any relief.

The Attorney General filed no brief herein for the reason that on the day Leuthold's petition was filed, one C. R. Rathbone instituted a proceeding to enjoin the defendants here from proceeding under Chapter 61, Laws of 1935, on the ground that the Act was unconstitutional. In each proceeding the Montana Stockgrowers Association and the Montana Woolgrowers Association appeared by counsel, who submitted briefs as *amici curiae*. The two matters were heard as one, and the divergent

views on the subject fully expounded. Plaintiff's brief in the Rathbone proceeding will be taken and considered as the brief of the defendants here on their motion to quash the alternative writ, and in support of their contention that the Act in question is unconstitutional.

In this proceeding questions of law are alone presented, and they are all based upon the alleged conflict of the Act of 1935 with specific constitutional provisions.

As we understand the position of the defendants here, wherein no rights of other applicants to lease this particular land are involved, and no question as to any opportunity to increase the annual rental by putting the lease up for competitive bidding is raised, it is asserted that the Act is invalid by reason of being in conflict with the following constitutional provisions:

(1) That it violates the prohibition against the enactment of local or special laws (sec. 26, Art. V), and the specific provision that no state lands ''nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition.'' (Sec. 1, Art. XVII.)

(2) That it constitutes a delegation of legislative power to an individual in giving the lessee the option to have his lease extended, in violation of section 1, Article V.

(3) That it violates section 4, Article XI, in that it seeks to deprive the state land board of its constitutional right to manage and control the state lands.

(4) That it was passed for the benefit of individuals and imposes upon the people a new liability in respect to transactions or considerations already passed, and is retroactive in nature, in violation of section 13 of Article XV, and, possibly (5), the Fourteenth Amendment to the Federal Constitution.

A determination of the questions thus presented requires a review, to some extent, of the history of our state lands and the laws enacted with respect thereto.

By the Act of Congress (Feb. 22, 1889, 25 Stat. 676), providing for the admission of Montana into the Union, the state was required to make provision for the establishment and maintenance of a system of public schools open to all children of the

state (sec. 4), and there were granted to the state for educational purposes, sections 16 and 36 of each township, with certain exceptions (sec. 10), and other lands for the support of the various higher educational institutions (secs. 14 and 17), and further lands for capitol building purposes (sec. 12). Therein it is provided that "all lands herein granted for educational purposes * * * may, under such regulations as the legislatures shall prescribe, be leased for periods of not more than five years." (Secs. 11 and 14, Act of February 22, 1889, 25 Stats. 676.) The terms of these grants were accepted by the state. (Constitution, sec. 7, Ordinance 1; *State ex rel. Galen* v. *District Court*, 42 Mont. 105, 112 Pac. 706.) The foregoing Act was amended in 1932, in particulars not important here, and therein the provision for leasing grazing lands for a period of not more than five years "under such regulations as the legislature may prescribe" was reiterated. The amendment was accepted by the state. (Chap. 84, Laws of 1933.)

Our Constitution (Art. XVII) declares: "Section 1. All lands of the state that have been, or that may hereafter be granted to the state by congress, and all lands acquired by gift or grant or devise, from any person or corporation, shall be public lands of the state, and shall be held in trust for the people, * * * and none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state. * * * Said lands shall be classified by the board of land commissioners, as follows: First, lands which are valuable only for grazing purposes," etc. "Section 2. The lands of the first of said classes may be sold or leased, under such rules and regulations as may be prescribed by law. * * * "

"The governor, superintendent of public instruction, secretary of state and attorney general" constitute the state board of land commissioners, and it has "the direction, control, leasing

and sale'' of these lands ''under such regulations and restrictions as may be prescribed by law.'' (Sec. 4, Art. XI.)

Under the original Act of regulation, in the absence of competitive bidding, the state board was authorized to determine the rental; a state land agent was provided for to act for the board, but his acts were ineffective unless approved by the board. (Laws 1891, p. 174a.) Later provision was made for a ''Register of State Lands,'' and leasers were given a preference right to re-lease at the highest bid made. (Laws 1899, p. 87.) In 1909 it was provided that the rental fixed by the state board should not be less than five per cent. of the appraised value of the land, and it was provided that a lease might be renewed at any time within thirty days of its expiration on notice to the ''register,'' if the leaser and the register agreed upon ''the value of the land.'' (Laws 1909, pp. 316, 318, Chap. 147, secs. 63, 68.)

In 1927 (Laws 1927, Chap. 60) the ''Department of State Lands and Investments'' was created, of which the state board is the governing body, but in charge of a ''Commissioner of State Lands and Investments,'' appointed by the Governor, who in turn appoints an ''assistant commissioner,'' and these two take the place of the former ''agent'' and ''register,'' and have the management of the land office. This Act provides for the selection, classification, appraisal and exchange of state lands, and, among other things, for the leasing of grazing lands. It is here provided that ''all leases for * * * grazing lands, * * * no matter on what date issued, shall expire on February 28 within five (5) years from the date on which the lease becomes effective.'' (Sec. 24.) Further, that ''a lessee who has paid all rentals due * * * and not violated the terms of his lease shall be entitled to have his lease renewed at any time within thirty (30) days prior to its expiration for an additional period of not exceeding five (5) years.'' (Sec. 21.)

Section 25 of this Act provides that ''the maximum annual grazing rental * * * shall not exceed, * * * ($100) * * * per section, except when the leasing price is increased above this sum by competitive bidding. For the purpose of

determining the rental price of grazing lands they shall be classified as follows: Class 1. Extra good grazing land * * * ($70.00) to * * * ($100.00)." The general form of the lease shall be prescribed by the state board, and no change in the form of such leases shall be made without the approval of the board. (Sec. 29.) In spite of the provisions of section 21, above, section 35 repeats the conditions, except as to the thirty-day provision, and declares the preference "to the extent that he may take the lease at the highest bid made by any other applicant." The state board is granted authority to prescribe additional rules and regulations not inconsistent with those prescribed by the legislature (sec. 37), particularly as to renewals "at the expiration of the term" (sec. 39), and may prescribe "additional rules and regulations * * * not inconsistent with the Enabling Act, the Constitution and the statutes." (Sec. 44.)

Before entering upon the consideration of the constitutional questions presented, we reiterate the oft-repeated declarations of this and other courts, respecting our attitude on this subject: The law-making body established by the Constitution has plenary power, except in so far as that power is curtailed by our Constitution, or the supreme law of the land, by clear and express limitations or prohibitions. (*State ex rel. Evans* v. *Stewart,* 53 Mont. 18, 161 Pac. 309; *O'Connell* v. *State Board of Equalization,* 95 Mont. 91, 25 Pac. (2d) 114.) It is our duty to uphold an Act of the legislature rather than condemn it, and no such Act should be held invalid on constitutional grounds, unless its unconstitutionality appears "beyond a reasonable doubt." (*Barney* v. *Board of Railroad Commrs.,* 93 Mont. 115, 17 Pac. (2d) 82, and cases there cited.)

We have held that the leasing of state lands constitutes the disposing of an interest in such lands, within the meaning of the constitutional prohibition contained in section 1 of Article XVII above, and, consequently, the question as to whether the present Act is a general or a special law is squarely presented. (*Rider* v. *Cooney,* 94 Mont. 295, 23 Pac. (2d) 261.)

The term "general law" as used in section 1 of Article XVII, and section 26 of Article V of our Constitution, does not necessarily mean a law which operates on all persons or all things pertaining to the subject of the legislation. The word "general" comes from the Latin *genus* and relates to the whole kind, class or order; hence a law which affects a class of persons or things, less than all, may be a general law. (*Brooks* v. *Hyde,* 37 Cal. 366.) Interdicted class legislation includes all laws that rest upon some false or deficient classification, and the vice in such laws is that they do not embrace all of the class to which they are naturally related. (*State* v. *Parsons,* 40 N. J. L. 1, see, also, *Roberts* v. *Hosking,* 95 Mont. 562, 28 Pac. (2d) 199; *Atchison etc. Ry.* v. *Matthews,* 174 U. S. 96, 19 Sup. Ct. 609, 43 L. Ed. 909; *Soon Hing* v. *Crowley,* 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145.) However, a law is general and uniform in its operation when it applies equally to all persons embraced within the class to which it is addressed, provided such classification is made upon some natural, intrinsic or constitutional distinction between the persons within the class and others not embraced within it, but is not "general" and makes an improper discrimination if it confers particular privileges or imposes peculiar disabilities upon a class of persons arbitrarily selected from a larger number of persons all of whom stand in the same relation to the privileges conferred or the disabilities imposed. The difference on which the classification is based must be such as, in some reasonable degree, will account for and justify the particular legislation. (*In re Miller,* 162 Cal. 687, 124 Pac. 427; *Equitable Life Assur. Co.* v. *Hart,* 55 Mont. 76, 173 Pac. 1062; *Tonn* v. *City of Helena,* 42 Mont. 127, 111 Pac. 715, 36 L. R. A. (n. s.) 1136; *State ex rel. Bray* v. *Long,* 21 Mont. 26, 52 Pac. 645.)

"Special laws are those made for individual cases, or for less than a class requiring laws appropriate to its peculiar condition and circumstances; local laws are special as to place. When prohibited, they are severally objectionable for not extending to the whole subject to which their provisions would be equally applicable, and thus permitting a diversity of laws relating to

the same subject. The object of the prohibition of special or local laws is to prevent this diversity." (1 Lewis' Sutherland on Statutory Construction, 2d ed., 358.)

Here the Act applies to all within a class—all leasers who were granted short-term leases in 1933; it is applicable to all falling within that class; it permits no diversity of laws on the same subject; rather, it requires that diversity of terms caused by administrative action be harmonized, to the end that all leasers enjoy the same "privileges, benefits and advantages."

The Act does not in any manner change the "general laws" applicable to the disposition of an interest in state lands, but imposes the duty of administration of those laws with equality to all. It does not, therefore, violate either section 26 of Article V, nor the requirement in this regard found in section 1 of Article XVII.

The paramount law, it is true, vests the control over state lands in the state board as the instrumentality to administer the trust in such manner "as to secure the largest measure of legitimate advantage to the beneficiary of it. To that end, and of necessity, the board must have a large discretionary power over the subject of the trust." (*State ex rel. Gravely* v. *Stewart*, 48 Mont. 347, 137 Pac. 854, 855; *Rider* v. *Cooney*, supra.) But wherever such control is mentioned in the Enabling Act and in the Constitution, it will be noted that it is specifically declared that the control and management are subject to such rules and regulations as are prescribed by the legislature. Of course, the legislature must act as a body and within its constitutional powers (*State of Montana ex rel. Haire* v. *Rice*, 204 U. S. 291, 27 Sup. Ct. 281, 51 L. Ed. 490), and it cannot under the guise of a regulation divest the board of its constitutional power to control and manage the state lands (*In re Canal Certificates*, 19 Colo. 63, 34 Pac. 274), but the legislature may by regulation fix the asking price for noncompetitive leases (*Rider* v. *Cooney*, supra), and the fixing of the term a lease shall run, within the constitutional limit of five years, falls in the same category. The legislature, composed as it is of members coming from all parts of the state, may be presumed to know.

the condition of the livestock industry in the state and what policy should be adopted in leasing state lands to stockmen in order to secure the best legitimate returns, or in fact any returns, from the leasing of such lands, and is presumed to act with full knowledge of the facts on which the legislation is based, and its conclusions on matters of policy are beyond judicial consideration. (*Chicago, M. & St. P. Ry.* v. *Tompkins,* 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417; *Rider* v. *Cooney,* supra.)

The provisions of section 24 of the Act of 1927 would seem to indicate a legislative intention that all grazing leases should be issued for a period of as nearly five years as possible, and yet expire on the twenty-eighth day of February, and such, under the admitted allegations here, has been the departmental interpretation of the regulation as to time by the "universal practice" in issuing leases, up to 1933.

There is no indication in the Act of 1933, providing that "all existing * * * leases shall, on renewal, be made to conform with the provisions of this Act" (sec. 3), of any legislative intent that this policy should be abandoned as a part of the leases expiring between the effective date of the Act and the next session of the legislature. Nor does the record here contain any intimation that the departure was pursuant to any "additional rules or regulations" promulgated by the board to meet the situation created by the Act of 1933, nor because of any change made by the board in the form of the leases to be thereafter issued.

With this situation before us, the legislative declaration of 1935 that the short-term leases shall now be "extended" for an additional three years "so as to give such lessees the same privileges, benefits, and advantages as are under authority of law conferred upon persons holding leases for a five-year period," is tantamount to a legislative interpretation of the Act of 1933—a pronouncement that the legislature intended originally that all leases issued under the Act of 1933 should be for as near a five-year period as might be, and still have them expire on February 28, within the five-year period.

The Act constitutes a valid legislative "regulation" and does not violate the provisions of section 4 of Article XI of the Constitution, vesting control over state lands in the land board. (*In re Leasing of State Lands*, 18 Colo. 359, 32 Pac. 986; *Betts v. Commissioners*, 27 Okl. 64, 110 Pac. 766.) As a part of the executive department of the state, the state board is subject to legislative control within the restrictions placed on the legislature, in this regard, by the Constitution. (*State ex rel. Public Service Com.* v. *Brannon*, 86 Mont. 200, 283 Pac. 202, 67 A. L. R. 1020.)

There is no merit in the assertion that, because the lessees are given the option to have their leases continued, the Act delegates legislative authority, in violation of section 1 of Article V.

It is further apparent that the Act of 1935 does not come within the prohibitions contained in section 13 of Article XV. The Act was not passed for the benefit of any individual or association of individuals, but for the benefit of a class comprised of all those leasers who were discriminated against in 1933, not under authority of the Act of that year, but by the act of the commissioner in restricting some leasers to a short-term lease, while granting the customary five-year lease to others. The 1935 Act merely places all on an equal basis for the five-year period.

Nor is the Act retroactive in the prohibited sense; it does not interfere with any vested right or impair the obligation of any contract; rather, it corrects such interference or impairment by departmental interpretation of the Act of 1933, and, even if it be conceded that the Act creates a new liability on the state "in respect to transactions or considerations already passed," there is no violation of this constitutional provision, as its prohibition protects only a "county or municipal subdivision of the state." (*In re Pomeroy*, 51 Mont. 119, 151 Pac. 333; *Mutual Benefit Life Ins. Co.* v. *Winne*, 20 Mont. 20, 49 Pac. 446; *State ex rel. Northwestern National Bank* v. *Dickerman*, 16 Mont. 278, 40 Pac. 698.)

As the classification here made is legally permissible and reasonable, and operates equally upon every person within the

given class, the Act is not obnoxious to the Fourteenth Amendment to the Federal Constitution. (*State ex rel. Redman* v. *Meyers*, 65 Mont. 124, 210 Pac. 1064; *Hill* v. *Rae*, 52 Mont. 378, 158 Pac. 826, Ann. Cas. 1917E, 210, L. R. A. 1917A, 495.)

It is ordered that a writ of mandate issue commanding the defendants to extend plaintiff's short-term lease for the additional period of three years from and after February 28, 1935.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, takes no part in the above decision.