STATE OF MONTANA EX REL. THOMAS W. HUGHES, PLAINTIFF, v. STATE BOARD OF LAND COMMISSIONERS OF THE STATE OF MONTANA, J. HUGO ARONSON, FORREST H. ANDERSON, FRANK MURRAY, AND HARRIET E. MILLER, AS THE MEMBERS OF THE STATE BOARD OF LAND COMMISSIONERS, J. HUGO ARONSON, AS THE PRESIDENT OF THE STATE BOARD OF LAND COMMISSIONERS, AND LOU E. BRETZKE AS THE COMMISSIONER OF STATE LANDS AND INVESTMENTS AND EX OFFICIO THE SECRETARY OF STATE BOARD OF LAND COMMISSIONERS, THE STATE OF MONTANA, AND THE MONTANA POWER COMPANY, A CORPORATION, DEFENDANTS.

No. 10152.
Submitted May 18, 1960. Decided June 17, 1960.
353 P.2d 331.

512

Toomey & Hughes, Helena, for plaintiff. Edmond G. Toomey argued orally.

Forrest H. Anderson, Atty. Gen., William F. Crowley, First Asst. Atty. Gen., Corette, Smith & Dean, Sam B. Chase, Jr., Butte, for respondent. William F. Crowley, Samuel B. Chase, Jr., and Robert D. Corette, Butte, argued orally.

MR. JUSTICE ANGSTMAN delivered the Opinion of the Court.

This is an action to enjoin the defendant Board of Land Commissioners from leasing to the defendant Montana Power Company certain described state lands for underground natural

gas storage purposes, and to enjoin the Board from selling to the Montana Power Company the native gas remaining in the lands described.

The contract which the Board proposes to make, unless restrained, has the approval of the Attorney General, is set forth in the complaint as an exhibit, and in substance contains the following provisions:

That the lease shall operate for a period of twenty years, and covers any and all formations down to the top of the Ellis formation, which is usually encountered in the area at a depth of about 2,800 feet. It gives the Power Company an express grant to inject and store gas in and under the surface of the ground and to withdraw the gas therefrom. It gives the Lessee the preferential right to renew the lease for an additional twenty-year period subject to such terms and conditions as the defendant Land Board may impose. The Power Company obligates itself to pay the sum of $4,800 per annum for the use of the premises for storage purposes. The Lessee is obliged to furnish a bond in the sum of $20,000 to be approved by the commissioner of State Lands and Investments, to indemnify the State against loss, damage or detriment by reason of failure of the Lessee to fully discharge the obligations contained in the lease.

It appears that all of the land involved herein had been leased by the State for oil and gas purposes, the State retaining a 12½ percent interest in and to the gas and oil produced.

The Power Company, either by direct lease from the Lessor, or by assignment by other Lessees, is now the owner of the right to explore for and produce gas from all of the land involved. The State of Montana, the Lessor, is offered the sum of $50,-183.52 as the value of the gas in place on the land, and in lieu of the State's royalty interest.

The record reveals that this latter figure was arrived at by having the Oil and Gas Conservation Board appraise the value of the interest of the State of Montana to the native gas remain-

ing in the zones and formations wherein gas is proposed to be stored. The Oil and Gas Conservation Commission fixed the value in the sum of $50,183.52.

In threatening to make this contract, the Land Board is acting under Chapter 213, Laws of 1955. Section 1 of this Act specifically authorizes the Board of Land Commissioners to lease "upon such terms as it may determine, not inconsistent with the enabling act and the constitution, state lands * * * for the underground storage of natural gas * * * to any natural gas public utility authorized to do business in this state". That section contains this clause:

"State lands which may be leased shall include lands in which the deposit of native gas shall have been depleted, provided the lessee pays to the state the amount specified by the state board of land commissioners for the native gas then remaining in the lands to be leased."

Other provisions of the statute will be alluded to later.

Plaintiff contends that Chapter 213 conflicts with section 11 of the Enabling Act which, after providing for the granting of easements or rights in state lands, contains this limitation:

"* * * provided, however, that none of such lands, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, has been paid or safely secured to the state."

Plaintiff also contends that it conflicts with that part of section 1 of Article XVII of the Montana Constitution, reading as follows:

"* * * and none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state".

Briefly, it is plaintiff's contention that Chapter 213 is not a general but a special law, and for that reason conflicts with the above-cited provisions of the Enabling Act and the Constitution.

The statute is presumed to be constitutional and valid, Rider v. Cooney, 94 Mont. 295, 23 P.2d 261; State ex rel. James v. Aronson, 132 Mont. 120, 314 P.2d 849; Cottingham v. State Board of Examiners, 134 Mont. 1, 328 P.2d 907.

A like contention was made in Leuthold v. Brandjord, 100 Mont. 96, 105, 47 P.2d 41, 44, and this court pointed out the distinction between a general and a special law as follows: "However, a law is general and uniform in its operation when it applies equally to all persons embraced within the class to which it is addressed, provided such classification is made upon some natural, intrinsic or constitutional distinction between the persons within the class and others not embraced within it, but is not 'general' and makes an improper discrimination if it confers particular privileges or imposes peculiar disabilities upon a class of persons arbitrarily selected from a larger number of persons all of whom stand in the same relation to the privileges conferred or the disabilities imposed. The difference on which the classification is based must be such as, in some reasonable degree, will account for and justify the particular legislation." Other cases reaching the same ultimate conclusion are Rutherford v. City of Great Falls, 107 Mont. 512, 86 P.2d 656; Blackford v. Judith Basin County, 109 Mont. 578, 98 P.2d 872, 126 A.L.R. 639, and State ex rel. Sparling v. Hitsman, 99 Mont. 521, 44 P.2d 747.

Chapter 213 applies to all persons within the class defined in the Act. It includes all persons engaged in the natural gas transmission or distribution business, and reaches everyone in that class who has a reasonable need for storage facilities for natural gas.

There is nothing in the case of Sjostrum v. State Highway Commission, 124 Mont. 562, 228 P.2d 238, so strongly relied upon by plaintiff, which militates against this view. Every

individual or corporation engaged as a natural gas public utility and having any reasonable need for storing gas may have the benefit afforded by this statute.

The next contention made by plaintiff is that the legislature by Chapter 213 unlawfully attempted to delegate to the defendant Land Board the power and authority to make rules and regulations relative to the leasing of State lands for underground natural gas storage purposes contrary to section 11 of the Enabling Act which, in part, provides:

"Except as otherwise provided herein, the said lands may be leased under such regulations as the legislature may prescribe."

Plaintiff contends, in substance, that the legislature must make the regulations, and that it is unlawful for it to delegate such authority to the Land Board. Chapter 213 contains these clauses: "The state board of land commissioners is hereby authorized and empowered to lease in such manner and upon such terms as it may determine, not inconsistent with the enabling act and the constitution, state lands * * * for the underground storage of natural gas * * *.

"The state board of land commissioners shall have the power and authority to prescribe such rules and regulations and to do and perform all acts and things * * * as it may deem necessary and proper relating to the leasing of state lands for the underground storage of natural gas and the sale of the gas remaining in state lands in a gas field wherein native gas deposits have been depleted."

In substance, plaintiff contends that the legislature in delegating powers to an administrative Board must itself prescribe the policy, standard or rule for the guidance of the administrative body, and cannot vest that board with arbitrary and uncontrolled discretion. He relies upon the general statement in 73 C.J.S., Public Administrative Bodies and Procedure, § 29, p. 322. But a careful reading of Chapter 213 will disclose that the legislature did prescribe the policy and rules for the guidance of the board and did set limits on the authority of the

Board, In no sense did it give the Board arbitrary or uncontrolled authority. It comes well within the rule stated in Forbes v. United States, 9 Cir., 1942, 125 F.2d 404, 408, where the court said:

"* * * To provide for the use of the Government lands by the public, Congress has enacted statutes conferring upon executive officers power to handle the administrative details, to prescribe rules and regulations governing the use of the lands in the various localities in order to carry out and fulfill the purposes of the statutes. Such authorizations are not unlawful delegations of legislative power, but amount merely to a conferring of administrative functions upon agents. United States v. Grimaud, 200 U.S. 506, 516, 517, 31 S.Ct. 480, 55 L.Ed. 563; Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406, 407, 48 S.Ct. 348, 72 L.Ed. 624." This court follows that general rule. Thompson v. Tobacco Root Co-Op, 121 Mont. 445, 193 P.2d 811, and cases therein cited.

■■ Plaintiff contends that the Enabling Act does not authorize the Land Board to lease state lands for the storage of natural gas since the Enabling Act is silent as to leases for such purposes. The Enabling Act, § 11, authorizes the State of Montana to lease lands and grant easements. It then contains this limitation: "* * * provided, however, that none of such lands, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition * * *". This clearly contemplates that an interest or estate, less than the fee, may be leased or disposed of. Moreover, when section 11 of the Enabling Act provides for the disposition of state lands, it of necessity includes the disposition of any interest therein. This follows from the maxim that "The greater contains the less." Section 49-128. It is of no consequence that the Enabling Act does not specifically mention leases for the storage of natural gas.

In Toomey v. State Board of Land Com'rs, 106 Mont. 547, 81 P.2d 407, this court held that the Land Board has authority

to enter into pooling agreements without the Enabling Act expressly referring to any such agreements.

The next contention made by plaintiff is that Chapter 213 conflicts with section 13, of Article XV, of the Constitution. Such section reads as follows:

"The legislative assembly shall pass no law for the benefit of a railroad or other corporation, or any individual or association of individuals, retrospective in its operation, or which imposes on the people of any county or municipal subdivision of the state, a new liability in respect to transactions or considerations already passed."

It is contended by plaintiff that only the Montana Power Company can benefit from the enactment of Chapter 213 since it owns and operates gas pipelines. This constitutional provision was enacted for the purpose of preventing retroactive statutes. Continental Oil Company v. Montana Concrete Co., 63 Mont. 223, 207 P. 116; Stanley v. Jeffries, 86 Mont. 114, 284 P. 134, 70 A.L.R. 166; and State ex rel. Siegfriedt v. Carbon County, 108 Mont. 510, 92 P.2d 301, 123 A.L.R. 1456.

There is in Chapter 213 nothing of a retroactive nature. It does not come within the prohibitions contained in section 13, of Article XV, of our Constitution. Compare Leuthold v. Brandjord, 100 Mont. 96, 47 P.2d 41.

Furthermore, there are others interested besides the Montana Power Company. The general public is also interested. Thus, it appears from the findings of the defendant Land Board that the Montana Power Company serves either directly or through three other utility companies approximately 81,000 customers in Montana; that the state supply of gas will not assure continuation of this necessary service beyond seven years; that the Power Company imports 30 million cubic feet of gas per day from Alberta under authority of the Federal Power Commission and needs storage facilities in order to have gas available to provide adequate, dependable and continuous service to its

customers. Hence, it can hardly be said that the only interested party concerned with this lease is the Montana Power Company.

The next contention of plaintiff is that Chapter 213 conflicts with section 81-901, R.C.M. 1947, which in part provides: "Lands which in the judgment of the board are likely to contain valuable deposits of coal, oil, oil shale, gas, phosphate, metals, sodium and, or other valuable mineral deposits, shall not be subject to sale, either the surface land or any of such deposits therein; provide, however that this shall not be so construed as to prohibit the sale of lands containing sand, gravel, building stone, brick clay or similar materials."

It is contended that the sale or attempted sale of native gas remaining in the storage lands is in violation of this section of the statute. The complete answer to this contention is that Chapter 213, being a later enactment, controls and in effect supersedes section 81-901 for the rule is fundamental that where two statutes are inconsistent the last in point of time supersedes the earlier one. Compare, Pioneer Motors, Inc. v. State Highway Comm., 118 Mont. 333, 165 P.2d 796, and State v. Holt, 121 Mont. 459, 194 P.2d 651.

Contention is made by plaintiff that the Land Board has failed to prescribe rules and regulations in accordance with Chapter 213, and that in consequence it has no authority to lease land for gas storage purposes or to sell gas remaining in such land about to be leased. It is true, that Chapter 213 gives the Land Board power and authority to prescribe rules and regulations with respect to the leasing of land for gas storage purposes and with respect to the sale of gas remaining in such land so leased. However, there is nothing in Chapter 213 which makes it mandatory that the Board make any rules and regulations. Obviously, it gives the Board authority to do so but it still has discretion as to whether and when it will make any such rules and regulations. What was said in Securities & Exchange Comm. v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 1760, 91 L.Ed. 1995, has application here. In that case, the court said:

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."

The next contention made by plaintiff is that before the Board has authority to act under Chapter 213, and to lease land for storage purposes, the deposits of natural gas must have been exhausted. In other words, it is plaintiff's contention that before the Board may lease such land the gas must have been removed therefrom down to a point where it is no longer capable of commercial production. We do not so interpret the statute. On its face, the statute indicates that the legislature did not anticipate or have in mind that all the gas should have been removed from a tract of land before it would become subject to lease for gas storage purposes, because it specifically provided that the Lessee must pay to the State the amount specified by the State Board of Land Commissioners for the native gas then remaining in the land to be leased. The language of the statute itself indicates that at least some gas may remain in the land about to be leased and in sufficient quantity moreover to require that the State be paid for the gas. Where the instrument containing the word "deplete" bears evidence on its face, as here, that the word "deplete" was not used synonymously with the word "exhaust", the court will give it that interpretation.

In re Estate of Woods, 181 Kan. 271, 311 P.2d 359, 361. In that case the court adopted the following as an apt definition of the word "deplete":

"Deplete is often used as though it implied merely a reduction in numbers, in quantity, or the like; discriminating writers or speakers, however, employ it only when they wished to suggest the potential harm of such a reduction or the impossibility of restoring what has been lost before such consequences are evident."

The court in the Woods case, supra, concluded that the word "depleted" was not synonymous with the word "exhausted".

The Board, in the case at bar, made the following findings:

"That this Board has consulted with the Oil and Gas Conservation Commission of the State of Montana, has received its report, and has determined that there has been a depletion of said deposit of native gas by the partial exhaustion thereof and has determined that the remaining quantity of native gas in said deposit makes the said reservoir effective for underground storage of natural gas, all as contemplated and specified in *said* Chapter 213."

The Board was warranted in making that finding. What the legislature evidently had in mind is this: That a gas field is depleted when the gas supply has been wholly or partially exhausted. The extent of the exhaustion need only be sufficient to make the land suitable as a place for the storage of natural gas.

The dissenting opinions complain that the gas in place was not sold at public auction.

There are two answers to this contention. It is true that school land may be disposed of only at public auction under section 11 of the Enabling Act, but that same section provides that land may be leased "under such regulations as the legislature may prescribe" and when an estate or interest is disposed of less than the land itself, section 11 provides that the full

market value of such estate or interest shall "be ascertained in such manner as may be provided by law".

The Constitution does not require that either the land or any estate or interest therein be sold at public auction.

Section 81-909, which was enacted in 1927, provides that "All sales of state lands shall be only at public auction". But this, by its terms, applies only to the sale of land rather than to the sale of some estate or interest therein. It was in effect when Toomey v. State Board of Land Com'rs, 106 Mont. 547, 561, 81 P.2d 407, 411, was decided.

Where, as here, the sale is only of an estate or interest in the land, a public sale is not required. This was expressly ruled in Toomey v. State Board of Land Comm'rs, supra, where this court said:

"Plaintiff contends that under section 11 of the Enabling Act, an estate or interest in lands cannot be sold except at public sale after advertising. This contention cannot be sustained. That limitation has to do only with a situation where the whole interest in the land is sold. When only an estate or interest in the land is sold, section 11 provides that the full market value of the estate or interest disposed of shall be ascertained 'in such manner as may be provided by law.' Such also is the provision of section 1, of Article XVII, of the Constitution. Hence, when an estate or interest in lands is sold, as distinguished from the land itself, there need not be a public sale and advertising unless the Legislature so directs. In other words, when there is a sale of only an estate or interest in such lands, the Legislature is given ample power to determine the method by which to ascertain the full market value of the estate or interest. Compare Leuthold v. Brandjord, 100 Mont. 96, 47 P.2d 41."

Then too, as pointed out in the dissenting opinions, the oil and gas leases were originally let on competitive bidding in strict compliance with the Enabling Act, if it applies, to the sale of only an estate or interest in land. The Oil and Gas Conservation Commission prepared and submitted to the defendant Land

Board a report on the geology of the area in which defendant Montana Power Company proposes to store its gas. The area is known as the Cobb Field and contains about 2,400 acres of state land and much more land held in private ownership. It has been producing gas for more than ten years. Geological studies have made it possible to determine with a fair degree of accuracy the amount of gas remaining in the reservoir, the amount of gas which can be produced commercially, and the amount which cannot be thus produced.

The report shows in detail the amount of gas left in the area. The report makes a computation of the present value of the royalty interest of the State based upon the number of cubic feet of recoverable gas remaining in the ground. That figure was placed at $44,063.68. This figure does not include a value for what is known as "cushion gas" which would remain in the ground after the abandonment pressure had been reached and were it not there the Company would be put to the expense of placing it there in order to place the reservoir in a condition, pressure wise, so that storage gas could be recovered. Figuring that at approximately half price would amount to an additional value of $6,119.84 which added to $44,063.68 makes the total valuation $50,183.52. There is nothing in the record to indicate that the State is not obtaining the fair value of the gas remaining in the land.

It seems to us that every reasonable effort was put forth to ascertain the present fair value of the gas remaining in the land. Were the dissenting opinions to become the law, then the state school fund would lose at least the $400 per month for the next twenty years as the rental for the storage reservoir, and there is no assurance that it would obtain any more for its royalty interest than what was allowed by the Oil and Gas Conservation Board.

It follows that the relief sought by plaintiff should be and is denied, and the action dismissed.

524

MR. CHIEF JUSTICE HARRISON and MR. JUSTICE CASTLES concur.

MR. JUSTICE BOTTOMLY dissenting.

I cannot agree with the majority opinion in this simulated controversy. This proceeding is just another "gimmick" or method of setting aside and anulling the saving provisions in our Enabling Act and State Constitution, which provisions were placed in each document for the purpose of protecting the sacred trust and heritage of our children and their children's children in the school lands of Montana.

In my opinion, Chapter 213, Laws of Montana 1955, is a special and exclusive law and therefore contravenes the limitations of section 11 of the Enabling Act as well as section 1, of Article XVII, section 13, of Article XV, and section 26, of Article V, of our State Constitution.

It is contended that it is imperative, expedient and for the best interest of the state that Chapter 213, Laws of 1955, be given effect. However, expediency has no place in the interpretation of the trust created by our Constitution here.

It is not my intention to further extend this opinion by setting out at length the unconstitutionality of Chapter 213, Laws of 1955. Apparently, the majority believe that what is expedient for Montana Power Company should be expedient for the people of the State of Montana and proceed on that basis. I do believe, however, that it is necessary to set out what Chapter 213, Laws of 1955, actually grants to this natural gas public utility which is a monoply in its field and location. The Montana Power Company either directly or indirectly has acquired regular oil and gas *leases* of state lands. These leases were initially acquired from the state by the regular constitutional method of *open competitive bidding at public auctions.* The original lease auctions were not restricted to a certain class of persons, corporations or partnerships. By means of this public auction, the State of Montana fulfilled the constitutional

mandate of section 1, of Article XVII, by obtaining as best could be determined the full market value for the land, pursuant to a *general* law. These original acquired leases carried certain rights and also certain liabilities. Now, by invoking the magic of the provisions of Chapter 213, Laws of 1955, the Montana Power Company seeks to cancel these leases and purchase the *estimated* entire remaining interest of the state in the gas in place in and under the described lands. They are to purchase this interest not at public auction, but merely by making a private agreement between themselves and the Land Board and pay a price determined by a guess on the part of the Montana Oil and Gas Commission as to what the state's interest is worth. I am cognizant of the fact that the original leases are or can be made "forever leases" and constitute also a sale of the state's interest, but that fact arises *only when the lessee continues to fulfill the requirements of the oil and gas lease.* However, this outright sale is quite a different matter. It does not fulfill the requirement that "full market value be obtained", nor that the sale be in "pursuance of general laws". The majority say the law is not special, but do not support the holding with any reasoning. The class to which this law, if constitutional, *must* apply consists of everyone who might buy or lease state lands. Yet, here the right is granted only to "natural gas public utilities authorized to do business in the state". What is natural about this classification? Why should said utilities be allowed this right of private purchase to the oil and gas in place and the right denied to all other lessees and buyers of state land? What is the intrinsic difference? What is the constitutional difference? These questions remain unanswered. Yet, the fact is that there are no natural, intrinsic or constitutional distinctions between the said utilities and all other lessees or buyers of state lands. The grant of the right to this special class without such distinction is a special and unconstitutional law.

One other question also is present here. In this instance Montana Power Company is converting *its* leases into an outright

sale. Is it not possible also that by this special law they could buy outright such interest leased to all others?

I can find nothing in Chapter 213, Laws of 1955, which would bar such a result. This grants this special class the right of eminent domain over all the State of Montana's oil and gas interests. Perhaps this dangerous situation was not called to the notice or attention of the Legislature. See Kerruish v. Industrial Accident Board, 112 Mont. 556, 118 P.2d 1049; Texas Pacific Coal & Oil Co. v. State, 125 Mont. 258, 234 P.2d 452, and cases therein cited.

I would make the temporary order permanent.

MR. JUSTICE ADAIR:

I concur in the foregoing dissent of Mr. Justice Bottomly.